Counsel. May it please the Court, Your Honors. My name is Dan Larson. I've been in Oregon for a petitioner, Ms. Antonia Chavez Meraz. This is a case that involves an attempted reinstatement of an expedited removal order issued in 2004. Could you go into – this is very similar to the case we just heard in the legal framework that applies. It is similar but different. How is it different? It is different because in this particular case, a petitioner had first entered the United States around 1991. She then came, married a permanent resident, and in 1995, he filed an I-130 petition for her. About that time, she went back down to Mexico to care for sick family members. And she was out of the country until 2001 – until 2000 when she attempted to reenter. And she did use a border crossing card with somebody else's name on it. Immediately when she was asked about it, she did retract that she admitted that it was not her. So she wasn't contesting the immigration officer's determination that she presented false identification? Correct. She didn't contest that at that time. But also, the record shows that she, through her declaration, that she wasn't explained what any of those things meant. And she was just sent back down to Mexico. But then she came back the next day, didn't she? Right. Right. And what was the – I'm sorry. Are you suggesting that she didn't understand when she was deported, after she presented the false identification and told she had to leave the country, what did she not understand? She didn't understand that she was deported. How could she not understand that she was deported if they took her back to Mexico? Well, at the border, when somebody is apprehended, people may be given voluntary departure. They actually do not – if they are taken at the border crossing through the desert, oftentimes they will not be deported or expeditiously deported. That was at the border. But here, both of the entries occurred, did they not, at the port of entry? No. No. Okay. The first one was at the port of entry, and then she sneaked across the desert. And then the second time, the day after she came through the desert. These facts are not helping your case. I mean, that – it seems to me to be pretty strong evidence that she knew darn well that she wasn't supposed to come back. But the next day, she got smarter and figured that if I cross someplace where there isn't an immigration officer in a booth, maybe I can get through. Well, one of the major issues – So what are the equities that compel our granting the relief that you're requesting? Well, one of the major issues here is that there are certain procedures that are supposed to be followed by the Border Patrol officers in going through the expat removal process. And among other, they are – they are supposed to ask questions and also allow and permit an opportunity to withdraw an application for admission, as well as they have authority to parole people into the United States. Now, which entry are we talking about? Are we talking about the first entry? The first one, correct. She presented the full identity? Right. And when she retracted and said, no, that's not me. And at that point, the officer at the border had a duty to inform and ask all these different questions. Well, counsel, this sort of raises a concern that Judge Beeser was raising with Ms. Andrade in the prior case. How many of these hearings are we going to conduct? This is now her third illegal entry that we know about, right? She came in illegally the first time in 91, and we don't know how many times she got caught with the false identification at the port of entry. But we'll give her the benefit of the doubt. We'll just call that the second illegal reentry. She admits that she did it with a false identification. Then she's deported, and she tries to sneak back again the next day. So how many times are we going to be conducting hearings to determine that she  Well, first and foremost, when the second time, she did not enter the United States. She did not actually enter the United States. She was at the border, and she was denied admission. Now, as a matter of fact, there's a distinction between arriving aliens and people who are in this position are applicants for admission. They're not arriving aliens, unless they have been admitted and they come in as mother status before. But in the eyes of the law, that second entry, she didn't have any legally recognized status, right? She was an illegal alien from 1991 until she got caught. Well, she was the beneficiary of an approved I-130 that was almost current. And the border patrol officer did not ask any questions. The record is devoid of any questions asked by the border patrol officer. Has anyone filed any papers for you? Wait. If she had a right to be here because she was married to a U.S. citizen, I don't understand why she would have been married to somebody with a permanent resident. And there's a waiting period. But whether you're married to a permanent resident or not, you can't present phony identification. That's true. And I can't see why she would if she had a right to be here on account of being married to a permanent resident. Well, because of the backlog in visa processing at that time, the visa priority was not yet current. And so she didn't have a right to be here despite the marriage. Correct. But she did have a right to be informed of the opportunity to withdraw the applications for admission. As a matter of fact, the bulk of people who are subjected to expedited removal procedures are given the opportunity to withdraw their applications. She could have consulted with the embassy before she departed. Pardon? She could have consulted with the embassy before she departed her native country. Well, but the embassy does not inform her of her rights. The Immigration Service does not inform people of their rights. And the earliest opportunity that she had of being informed of any type of rights and for discretion to be exercised at the border was when she came to the border trying to get back with an approved I-130, but still it had not been the priority. I'm missing something here in the argument. I'm just missing a step. There's no question she violates the law by presenting false ID. There's no question she doesn't have a right to be here because the paperwork isn't all done on her marriage to a legal permanent resident. Had she been fully advised on the law, there's a way she could have prevented her predicament from being as bad as it turned out to be. I don't understand why this isn't just like all the other cases where there's immigration or criminal or civil, where if somebody had only had really good legal advice, they could have prevented their predicament from being as bad as it turned out to be. No, it's a different situation when you have procedures that the Border Patrol officers are supposed to be following. What if she told the truth the second time around? What if she'd said, you know, my name is Antonio Chavez-Moraz and I am married to a lawful permanent resident, U.S. citizen. I've had an I-130 application initially approved, but I don't have my visa yet. What different procedure would have been invoked at that point if she'd been truthful with the application? Well, again, it's difficult to speculate what would have been done. What's the procedure in that case that should happen? What should happen is that the Border Patrol officers should ask questions. They should give people the opportunity to withdraw their applications for admission, and they should be exercising their discretion. So the result would have been the same? She would have been deported at that point? No, no, no. If she had been given the opportunity to withdraw the application for admission, she would, as soon as she, as the priority date became current, she would be given the opportunity to come in without needing any type of waivers. Yeah, but they wouldn't have allowed her in, I guess is the question. Yes, they would. She still would have had to have gone back to Mexico that day. But she never came into the United States. Right. She never entered at that first entry. And there's a law that requires that she be told these things and she wasn't told? Yes. The regulations regarding expedited removal requires that the officers at the border inform people of the right, similar to when an immigration judge has the duty to inform people of the avenues for relief. So it really all comes down to the jurisdiction stripping? Exactly. Well, it does to some extent. But also, here we have no other avenue for her to file. For example, in a removal situation, you have motions to reopen. Now, the Lynn V. Gonzales case that I submitted today as supplemental authority stands for the fact that an immigration judge does have jurisdiction to, on a motion to reopen, even if the person has departed and then come back, if there were issues with the underlying removal order. In addition, the other case that I submitted is that there's at least the Board of Immigration Appeals held that where the record didn't substantiate that the expedited removal procedures had been followed, for purposes of being eligible for cancellation of removal, it did not break the continuous physical presence. And so basically what we have here is even when she came into the United States after having had that expedited removal order issued, she then filed for actually a waiver as part of her adjustment application. Is that the Form 212? Well, she filed the I-601, which was for the misrepresentation. And she stated, which... You're over time, so... Pardon? You're past your deadline, so just go ahead and finish up the answer. Yeah, she filed pro se for a waiver that they thought that they needed to have. Thank you, Counsel. Please, the Court. Barry Pettinato. I should have pointed out two things that apply to both cases the first time around, and I'll point them out now. First is the statute at 1252e5. These challenges that both these Petitioners are making to the inadmissibility determination that was made by the inspectors, it's clearly not subject to review. I'll quote 1252e5. It says, And here's the important part. There should be no review of whether the alien is actually inadmissible. In other words, Congress intended that determination is going to be made entirely by the immigration inspector, and it's not going to be subject to review by any court for the very reason that these are aliens, arriving aliens, excludable aliens,  The other thing I want to point out is some language in Morales, the in-bank decision in Morales 2, that essentially says reinstatement of prior orders, prior removal orders, regardless of the process afforded in the underlying order, does not offend due process because reinstatement of prior orders does not change the alien's rights or remedies. That's at 497. It's your position, then, that we have an absolute bar to our jurisdiction in these cases, both of them. It is, Your Honor. Essentially, that's what it comes down to. I think the Court doesn't have any jurisdiction. And you can find it through a number of the statutes sections in the INA, or you can find it through this Court's case law, you know, Alvarez. And we don't have to look to regulations. It's just the face of the Act is clear on its face. Right. And this Court in Morales and in other cases has pretty much said so. There's really no jurisdiction here. In this case, actually, in the end, really, this Court can just resolve this case by the Court's decision in Padilla. Padilla says an arriving alien, an alien that's been reinstated, pursuant to the reinstatement statute at 1231A5, is not eligible for any relief. This petitioner here wanted adjustment of status. Padilla controlled. However, what happened after Padilla in this Court's decision in Perez-Gonzalez, this Court carved out a very narrow exception that said, okay, that's the general rule, but if an alien actually files an I-212 before the alien is reinstated under the government should adjudicate that I-212, permission to reenter. And that was the law of the circuit for a while. But that still does not require the physical presence in the United States to have that adjudication. No. As a matter of fact. So you can do it in Mexico City and stay there until you get a response. Exactly. It doesn't require you being in the United States. So what ended up happening was in the Court's recent decision in Gonzalez, which applied Brand X and Chevron deference, this Court said, night 28J, this letter about a week, the decision in Gonzalez, the Court said because of Brand X and because of Chevron deference, we are no longer, the panel decision in Perez-Gonzalez is no longer good law. And so it basically said. So this was that decision, I think Judge Callahan wrote it about a month ago. Yes. About a month ago or so, yeah. What was the name of it again? It's called Gonzalez v. Mukasey. It's I-28J, I have a 28J letter I attached. 28J letter, got it. It essentially said Perez-Gonzalez is no longer good law. So this case goes back to the general rule that this Court established in Padilla saying an alien who is in reinstatement proceedings simply is not eligible for endurance relief under the plain language of 1231A5. And that's where this case now resides. It's really that simple. In fact, the Court in Gonzalez said what's important now is the Board's decision in Torres-Garcia. And Torres-Garcia says an alien who is in the same posture as this Petitioner, illegally was previously removed, illegally re-enters and then tries to seek adjustment of status, is ineligible for that relief unless two things occur. One, they have to stay on trial. They have to stay out of the country for 10 years. And they have to, after the 10 years, they can ask the Attorney General to, if they can, be readmitted. And in Morales-Skirto, I mean, in the Gonzalez case, essentially the Court said under the reasoning of Torres-Garcia, as a matter of law, these aliens are not eligible for adjustment of status. And that's the same with the Petitioner here. He's statutorily ineligible for adjustment of status, and the Court has no jurisdiction over the petition for review as it relates to reinstatement. Because in this case, the Petitioner concedes all the predicate facts of the case. They don't contest that they were her alien age. She doesn't contest that she was previously removed and that she illegally re-entered. Those are the three predicates that the Court could look at. They don't contest them at all in any way in this case. And so the Court is stripped of all jurisdiction after that. Are you urging us to publish in this case? I think it would be helpful, Your Honor, either in either case, because these attacks on the expedited removal orders continue. And I think it would be important for the Court to clarify that, especially after Morales-Skirto, the in-bank decision. If we accepted your argument, we could do a judgment order citing one case, right? I believe so. Is there anything to say after Morales-Skirto and after that case that came down a month ago? Is there any? I'm sorry, what's the question? I don't understand why we'd publish if it's just on all fours, controlled by Morales-Skirto and the case that came down a month ago. This one in particular is not on a ñ it hasn't really been fully addressed. What happened was Gonzales ñ the Gonzales said Perez-Gonzales is no longer going to be the good law. And this case would be the first court that said, okay, yes, under the same facts now, in light of what's happened with the abdication of Perez-Gonzales, this is the law. I mean, you can get there through by extrapolating from the Gonzales case, but we don't really have a case that says that's the law. What's the law? Since then. The statute means what it says. The statute means what it says, basically. I thought we already said that in those two cases. Well, you have. You have said it in a number of cases. But these cases continue to be an onslaught of them, so the clearer the court makes it, I think, the better. It doesn't matter how clear it is. There will always be cases. I guess. I guess that's the nature of immigration law. Probably we have how many? Backed up, 30,000, 40,000? Your guess is as good as mine. Did the briefing start in this case before Morales-Skirto? It did. And we threw this case into abeyance for a long time, waiting for the in-bank decision in Morales. And when it came out, we briefed. We put it in. So you briefed after? We briefed after Morales. Yeah. We actually briefed this case after Morales. I think you did. Did we? Yeah, I think we did. I think Morales-Skirto was cited. In the brief? Yeah. Yeah, because I think what happened was both sides agreed to put it in abeyance even before Petitioner. And he just sat on it. For a long time. Right. That's what ended up happening. Thank you, Your Honor. Thank you, Counsel. Take one minute, even though you went over. Again, one of the... Is there some question that isn't answered by Morales-Skirto in the case, in the 28-J letter? Do we need to make something clear for you that the in-bank decision did not make? Yes, it needs to be made clear. In this case, Petitioner did file a habeas petition. Okay. But it was after the order was reinstated, correct? Well, it's not entirely. She filed the habeas petition, and the waivers that had been filed had not been adjudicated at that point. And as a matter of fact, what Padilla says is that also whether the person has permission to return. Now, the Real ID Act did fix some of these, the issue of having legal and constitutional claims. And as a matter of fact, there is judicial review of reinstatement orders in INA 242E, as well as in INA 242D, which says review of a final order if exhaustion and no other  order. And since there is no place to file for a motion to reopen or challenge that expedite removal order, where do you do that? And the concern here is that if the Border Patrol officers summarily and perhaps do not follow the procedures correctly, that there is absolutely no review with no relief for somebody who, in fact, has really a lesser penalty, so to speak, by issuance of an expedite removal order, which makes them inadmissible for 5 years, as opposed to a removal order, which is for 10 years. Now, in addition to that, you have, you have waivers that have not been adjudicated basically on the grounds that, well, we can just reinstate. Well, it doesn't make any logical sense that somebody who has been denied entry has not really entered, is given fewer rights and absolutely no review, and summarily denied even requesting waivers. Have you taken it up with Congress? Well, the statute for reinstatement also is fairly clear. It does not say specifically expedited removal orders in terms of the reinstatement says removal orders. So there is, there is some. But the effect of the order is removal, is it not? That's what's being reinstated, an order removing the alien. Well, you can't be removed if you haven't really entered. There's a difference. If you haven't entered, then how can you be removed? And they actually are being denied entry. They're applicants for admission. The purpose of the statute was to do away with that nomenclature between excludable and, like, I forget what the other side was. Yeah, exclusion and inadmissible. Yeah. Well, but in the, before IRR in 1997, people who were put in exclusion proceedings did have a right to a hearing. And we had encrusted inclusion with so many complications that it didn't mean exclusion anymore. You were here while you were excluded. Right. Well, here we also have now have an expanded, on the southern border, 50 miles into the United States of expedited removal. So does due process start at mile 51? That's when you have safeguards that are supposed to be following. Well, it's not like we have a law that says you can come within the first 50 miles of the United States and it's no problem. It's just dealing with when people get caught. Well, at the time of this incident, it was not expanded to 50 miles at that time. That has been expanded since. And the right to cross the border at all. Pardon? But there's no right to illegally cross the border at all. That's true. But people who do apply for admission do have rights. And there are procedures that need to be followed when they attempt to enter. And there is discretion, especially when you have somebody who has, such as in this case, an approved I-130 application that is actually became current shortly thereafter. Thank you, counsel. Oh, one more thing. I have one more question I need to ask you. If she had just waited in Mexico until her wife of a legal resident application had been approved shortly thereafter, would she have been fine? Actually, her application, underlying application had been approved before she attempted to enter in 2000. So if she had just waited a little while and used her right name, she'd have had papers, she'd have been fine? She'd have had a visa. That's what she was waiting for. Well, she was waiting for that visa number to become available. And she would have had it if she just waited a little while. And then she could have come in legally? Correct. Got it. Thanks. Next is multi-care health system versus family health.
judges: Beezer, Kleinfeld, Tallman